IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| GREGORY H. LADNER,<br>    Plaintiff, | )<br>)<br>) |
| v. | )   Case No. 1:11-cv-1290 |
| TED HULL, et al.,<br>    Defendants. | )<br>)<br>) |

## MEMORANDUM OPINION

At issue in this civil rights dispute is whether there is a genuine issue of material fact that a prisoner's free exercise rights were substantially burdened by a prison's policies. The prisoner plaintiff, originally proceeding pro se, filed this civil action, alleging that defendants violated plaintiff's right to access the courts and his free exercise rights. On June 18, 2013, defendants' motion for summary judgment was granted in part and denied in part. Specifically, the motion was granted with respect to plaintiff's denial of access to the courts claim. The motion was denied on plaintiff's free exercise claim, and the parties were directed to submit supplemental briefing on that issue. Specifically, the parties were directed to address (1) plaintiff's housing status at NNRJ; (2) whether plaintiff was on "24-hour maximum security lockdown," and if so, how he came to be there; (3) whether "24-hour lockdown" is the same as administrative segregation; (4) the consequences of being on "24-hour lockdown;" and (5) whether plaintiff could receive visitors, including clergymen, in his assigned housing unit. (Doc. 34).

The matter is now before the Court on defendants' supplemental memorandum in support of their motion for summary judgment. (Doc. 36). As the parties have fully briefed and argued the issue, it is now ripe for disposition.

I.

Plaintiff Gregory H. Ladner is a former Virginia inmate at Norther Neck Regional Jail ("NNRJ"), who was originally proceeding pro se. Defendants are Ted Hull, Superintendent of NNRJ, and Captain Darryl Turner, head of security at NNRJ.

Plaintiff was housed at NNRJ between August 20, 2010 and October 18, 2010, on his way to federal custody. See Compl., Att. 1, Handwritten, at 1; Def. Br., Ex. 1, Hull Aff. ¶ 2. Plaintiff alleged that, during that time he was (i) unable to communicate effectively with his attorney, (ii) allowed only limited access to the law library, (iii) denied use of a typewriter to prepare legal materials, and (iv) not allowed to photocopy legal materials. Am. Compl., at 2-3. Plaintiff also alleged a violation of his free exercise rights.[1] Specifically, plaintiff alleged that, after telling officials that he was a Born-Again Christian and asking when he could attend church services, an official told him "that there were none at that jail." Id. When plaintiff inquired about weekday Bible study services or "any services of [his] faith," he was again allegedly told that none were available. Id.

In support of defendants' initial motion for summary judgment, defendants provided Ted Hull's affidavit, in which Hull stated that, although "there are no formal religious services for any denomination or faith at NNRJ," there are "volunteer clergy men and women who visit and counsel with inmates for all major faiths except for Islam and Buddhism." Def. Br., Ex. 1, Hull Aff. ¶ 11. According to Hull, NNRJ also works with non-denominational volunteers, and any inmate who wishes to meet with a volunteer may file a request for such a meeting. Id. ¶ 12. In addition, Hull averred that "an inmate is afforded individual or group services, typically bible study and discussion,

---

[1] Plaintiff also initially alleged that he was served inadequate food, was provided with inadequate clothing, and was discriminated against by jail officials. See Compl., Att. 1, Handwritten, at 3-5. These claims were dismissed by Order dated September 11, 2012. (Doc. 17).

2

and can receive individual religious prayer and counseling sessions upon request." Def. Reb. Br., Ex. A, Hull Aff. ¶ 3. Moreover, when plaintiff arrived at NNRJ, he signed a document informing him of available programs, including religious programs such as "BIBLE STUDY," "JAIL CHAPLAIN," and "GROUP CHURCH SERVICES." Id. ¶ 2; Id., Att. 1, Northern Neck Regional Jail Offered Programs. Plaintiff submitted several requests during his time at NNRJ, but none related to religious programs. Id. Att. 2, Inmate Request Forms.

In response, plaintiff stated that, although he may have had access to this religious counseling, he was:

> ... on a 24 hour maximum security lockdown within a pod except for a 45 minutes to 60 minutes time [sic] in the NNRJ law library once a week .... There were no or ever had been [sic] one religious clergy person that has ever been on or inside of my pod or any other one. [He] had no knowledge neither did any other inmate that knew [sic] that requests [could] be made for a clergy visit there at NNRJ. There were [sic] no going out of [the] maximum security pod for any religious services for prayer or any counseling whatsoever. There were no [sic] information given by the jail in regards to any clergy visits or services. There were no announcements on any Sunday for any kind of a religious services that will be held ever [sic].

Pl.'s Resp., at 10-11. Because there were material disputes of fact whether plaintiff knew he could receive visitors and whether he was able to receive visitors, summary judgment was denied on plaintiff's free exercise claim. (Doc. 34). The parties were directed to submit additional briefing on the free exercise claim.

In defendants' supplemental brief, defendants offer the following evidence:

- Hull avers that plaintiff was housed in "general purpose" housing for his entire stay at NNRJ and was not housed in any kind of administrative segregation. See Def. Supp. Br., Ex. A, Hull Aff. ¶¶ 2-3, 5.

- Hull avers that plaintiff's housing unit was never placed on lockdown status during the day. Id. ¶ 3.

- Hull further avers that "[d]uring the period of [plaintiff's] incarceration, he enjoyed full, unrestricted privileges in [his housing unit]. These privileges included the ability to receive visitors. These visitors could include clergy men and women." Id. ¶ 4.

- Hull further avers that "pursuant to NNRJ Standard Operating Procedure ..., [plaintiff] would have been informed of programs and he would have been provided a copy of the NNRJ Inmate Handbook Rules and Regulations ("Handbook") during the Booking and Classification process" and that the Handbook "explained that [plaintiff] had access to certain religious services and how he could go about requesting such services." Id. ¶ 7

- Hull further avers that "[plaintiff] acknowledged that he had been informed of religious programs available to him by signing the [Northern Neck Regional Jail Offered Programs] document, which advised him of all the offered programs at NNRJ. Id. ¶ 7; id. Att. 2, Northern Neck Regional Jail Offered Programs.

Defendants also provided a copy of the NNRJ Inmate Handbook. See id., Att. 3, at 3. Section 20, entitled "Religious Services," informs inmates that:

> A. A Faith Representative is available to counsel inmates concerning any problem or matter of a religious nature.
>
> B. Special requests of a religious nature should be brought to the attention of the Program Coordinator by submitting a written request on the standard Inmate Request Form
>
> C. The Jail presently affords inmates an opportunity to attend Church Services and Bible Study on a weekly basis.
>
>> 1. The names of inmates desiring to participate in Religious services will be screened for security purposes.
>>
>> 2. Due to space limitations, restrictions are placed on the number of inmates allowed to attend services and programs at one time.
>>
>> 3. Cell visitation will be made available to inmates unable to attend religious services due to special housing needs or other circumstances.
>
> D. Inmates of faiths other than Protestant or Catholic, and anyone who's faith stipulates specific requirements, should contact the Programs Coordinator and make their requirements known.

Id.

In plaintiff's supplemental response brief, plaintiff states that the "general housing" to which Hull refers is divided into minimum security housing, which consists of a dormitory, and maximum security housing, which consists of traditional prison pods. See Pl. Supp. Resp., at 1-2. Plaintiff further states that he was housed in a maximum security pod, and that inmates in maximum security pods do not share the same privileges as inmates in minimum security pods. Id. at 2. Yet, plaintiff does not explain the specific differences in privileges afforded to each group. Id. Nor does plaintiff provide any evidence that NNRJ denied prisoners in maximum security housing access to religious programs. Moreover, plaintiff acknowledges receiving the signed document listing the religious programs available to prisoners, but states that he was nonetheless "not aware of [the] religious programs . . . because [he was] told more than 3 times by NNRJ staff officer that there were no longer any Religious Services or Bible Study Services ... at NNRJ." Id. at 4.

Beyond conclusory statements, the only evidence plaintiff identifies is Hull's statement that "there are no formal religious services for any denomination or faith at NNRJ," Def. Br., Ex. 1, Hull Aff. ¶ 11. Plaintiff contends that this undermines the Handbook's credibility.

## II.

Summary judgment shall be granted if the evidence on file "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that judgment as a matter of law is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To meet that burden, the moving party must demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a moving party shows it is entitled to judgment as a matter of law, the burden shifts to the nonmoving party to point out the specific facts that create disputed factual issues. Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must present some evidence, other than its initial pleadings, to show that there is more than just a "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Celotex, 477 U.S. at 324 (quoting Rule 56(e) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by [other evidence] designate 'specific facts showing that there is a genuine issue for trial.'"). In evaluating a motion for summary judgment, a district court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The moving party need only prove material facts, and "the substantive law will identify which facts are material." Anderson, 477 U.S. at 248. Put differently, "[o]nly disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. An issue of material fact is genuine when, "the evidence . . . create[s] [a] fair doubt; wholly speculative assertions will not suffice." Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), abrogated on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the nonmoving party. Matsushita Elec. Indus. Co., 475 U.S. at 587.

### III.

Based on all of the facts provided, defendants are entitled to summary judgment because plaintiff has not adduced competent record evidence sufficient to raise a genuine issue of material fact that NNRJ's religious policies burdened plaintiff's free exercise rights.

At the threshold, a plaintiff claiming a violation of the Free Exercise Clause must show that he sincerely holds his religious belief. Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 717 (1981). Importantly, the question whether a plaintiff sincerely holds a religious belief does not "turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Id. at 715. Here, defendants do not contest that plaintiff's religious beliefs are sincerely held.

Once a plaintiff establishes a sincerely held religious belief, he must show that the regulation imposes a substantial burden on the exercise of religion that is not justified by a compelling state interest. Hernandez v. Comm'r., 490 U.S. 680, 699 (1989). Importantly, however, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. city of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Employment Div., Dep't. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)). The question whether a regulation imposes a "substantial burden" has been framed in a number of ways, including "putting substantial pressure on an adherent to modify his behavior and violate his beliefs," Thomas, 450 U.S. at 717-18, and forcing an individual to "choose between following the precepts of [his] religion and forfeiting benefit, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other." Sherbert v. Verner, 374 U.S. 398, 404 (1963).

Importantly, prisoners do not maintain the same degree of First Amendment rights as the general public. Specifically, "[a] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the

corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Accordingly, an inmate does not have the same protection from restrictions on his rights to practice his religion as do members of the general public; thus, prison officials may enact restrictions on an inmate's ability to practice his religion so long as the official can show that the restrictions are reasonably related to legitimate penological interests. See, e.g., O'Lone v. Estate of Shabazz, 482 U.S. 342, 350 (1987) (rejecting the idea that prison staff must prove that their chosen method of running an institution is the least burdensome to an inmate's First Amendment rights). If an inmate shows that his free exercise rights have been burdened, courts will determine whether the burden is reasonably related to a legitimate penological interest. The plaintiff bears the burden of proving that a particular regulation or practice is unreasonable. See Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

Here, plaintiff has established that he sincerely holds his religious beliefs. But he has not adduced competent record evidence sufficient to raise a genuine issue of material fact that the NNRJ's religious policies impose a substantial burden on his free exercise rights. A party opposing a motion for summary judgment must present some degree of probative evidence, other than mere allegations, in order to defeat the motion. See Anderson, 477 U.S. at 248-49 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290 (1968)). To meet this burden, the nonmoving party must do more than repeat the allegations stated in his initial pleadings, see Celotex, 477 U.S. at 324; he must provide evidence that is more than "merely colorable," Anderson, 477 U.S. at 249 (internal citations omitted). Plaintiff relies almost entirely on conclusory statements that he was denied religious privileges, and therefore has not provided evidence sufficient to raise a genuine issue that he his free exercise rights were substantially burdened.

There is no evidence that the defendants' actions "put[] substantial pressure on [plaintiff] to modify his behavior and violate his beliefs," Thomas, 450 U.S. at 717-18, or forced plaintiff to choose between the precepts of his religion and prison benefit, Sherbert v. Verner, 374 U.S. 398, 404 (1963). To the contrary, the evidence shows that defendants provided plaintiff with the Handbook, which included information about the various ways that plaintiff could practice his religion while confined at NNRJ. Plaintiff contends that he was unaware of the religious accommodations outlined in the Handbook, and thus did not know he could utilize them. But any failure on his part to read the Handbook is not attributable to the defendants.

Plaintiff also points to Hull's statement that "there are no formal religious services for any denomination or faith at NNRJ," Def. Br., Ex. 1, Hull Aff. ¶ 11, as evidence that the Handbook did not accurately describe the programs available to prisoners to NNRJ. Although it is undisputed that, contrary to the language of the Handbook, NNRJ did not offer weekly services, it does not follow that plaintiff's free exercise rights were substantially burdened. The Handbook makes clear that NNRJ provided plaintiff with alternative ways to practice his religion. Specifically, the Handbook allows for "cell visitation" for "inmates unable to attend religious services," and states that "[a] Faith Representative is available to counsel inmates concerning any problem or matter of a religious nature." Def. Supp. Br., Ex. A, Hull, Att. 3, at 3. Most importantly, the Handbook prescribes a procedure for prisoners for whom these religious accommodations are insufficient. Specifically, the Handbook states that "anyone who's faith stipulates specific requirements, should contact Programs Coordinator and make their requirements known." Id. Plaintiff provides no evidence that he attempted to take advantage of any of these opportunities to practice his religion.

Plaintiff also alleges that the defendants acted in bad faith by providing an undated copy of

the NNRJ Inmate Handbook as evidence. He states that, because there is no date provided, "the defendants could have just changed this Handbook or recently just updated it." He also states that he "do[es] not recall ever seeing or knowing Section 20 in this Handbook," or "ever receiving any Handbook from NNRJ during [his] intake there." Pl. Supp. Resp., at 5 ¶ 9. But plaintiff has failed to adduce competent record evidence sufficient to raise a genuine issue that the Handbook provided is the product of defendants' misconduct. Plaintiff's conclusory allegations cannot defeat defendants' motion.

Indeed, defendants' evidence shows both that opportunities to practice plaintiff's religion were available to plaintiff during his incarceration at NNRJ and that plaintiff had notice of those religious opportunities. Plaintiff had access to a "faith representative," knew how to access that individual, and was on notice that he could fill out inmate request forms for any type of religious need. As these policies gave plaintiff an adequate means to practice his religion and did not impose a substantial burden on his ability to do so, there is no genuine dispute of material fact that plaintiff's free exercise rights were not substantially burdened. Thus, defendants are entitled to summary judgment.

## IV.

For the reasons stated here, defendants' motion for summary judgment must be granted in its entirety and summary judgment must be entered in their favor.

An appropriate Order shall issue.

Alexandria, Virginia
September 3, 2015

T. S. Ellis, III
United States District Judge